McKEY v. CLARK et al.

In re TOMLINSON–HUMES, Inc.

(Circuit Court of Appeals, Ninth Circuit. July 10, 1916.)

No. 2721.

1. SALES ⊜⇒197—OPTION CONTRACTS—PASSAGE OF TITLE.

Where the owner of valuable paintings gave a dealer an option to purchase and allowed the dealer to take possession, it appearing that he sold such paintings, no title passed to the dealer, his possession being merely that of one with an option to purchase.

[Ed. Note.—For other cases, see Sales, Cent. Dig. §§ 512, 513; Dec. Dig. ⊜⇒197.]

2. PRINCIPAL AND AGENT ⊜⇒129—AGENTS' CONTRACTS—SALES—TITLE ACQUIRED.

Where the holder of an option to purchase paintings agreed with defendant to purchase them for defendant's benefit, defendant furnishing the purchase price, the holder of the option is bound, on completing the purchase, to transfer the paintings to defendant.

[Ed. Note.—For other cases, see Principal and Agent, Cent. Dig. §§ 451–457; Dec. Dig. ⊜⇒129.]

3. BANKRUPTCY ⊜⇒140(3)—AGENCY—REVOCATION.

Where defendant commissioned a dealer in paintings to purchase them for him and to resell them on commission, at the dealer's bankruptcy, possession of the paintings being delivered to the dealer, revoked the agency.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. § 225; Dec. Dig. ⊜⇒140(3).]

4. BANKRUPTCY ⊜⇒140(3)—CONSTRUCTION—PASSAGE OF TITLE.

A dealer having an option to purchase paintings, agreed to purchase the paintings for defendant, who furnished the purchase price, and then to act as defendant's agent to resell the paintings on commission. To enable the dealer to negotiate for a reduced price, defendant's connection with the transaction was concealed, but after the owner transferred the paintings to the dealer, the dealer executed a bill of sale to defendant, whose agent, after receiving possession, redelivered the pictures to the dealer for sale. Thereafter the dealer became bankrupt, and his trustee asserted title to the paintings. *Held,* that the dealer was a mere conduit of title, and no title vested in it which could be asserted by the trustee.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. § 225; Dec. Dig. ⊜⇒140(3).]

Appeal from the District Court of the United States for the Southern Division of the Southern District of California; Oscar A. Trippet, Judge.

Suit by Frank M. McKey, trustee in bankruptcy of Tomlinson-Humes, Incorporated, bankrupt, against Eli P. Clark and another. Judgment for defendants. Plaintiff appeals. Affirmed.

Mulford & Dryer and Wilbur Bassett, all of Los Angeles, Cal., for appellant.

Herbert J. Goudge and Hartley Shaw, both of Los Angeles, Cal., for appellees.

Before GILBERT, MORROW, and HUNT, Circuit Judges

⊜⇒For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

HUNT, Circuit Judge. McKey, trustee in bankruptcy of the estate of Tomlinson-Humes, Incorporated, bankrupt, brought suit in equity against E. P. Clark and Los Angeles Warehouse Company, a corporation, to recover possession of certain valuable Hogarth paintings, alleging that the paintings are part of the assets of the bankrupt estate. Defendants admitted that defendant Clark was in possession and control of the paintings, and alleged that the defendant Los Angeles Warehouse Company had no right or title in the paintings except as agent and warehouseman for the defendant Clark, but denied that the paintings were any part of the assets of the estate of the bankrupt, and alleged that they belonged to the defendant Clark. There was a trial, which resulted in the dismissal of the bill, and from the order of dismissal the plaintiff has appealed.

The facts are substantially as follows:

Prior to February, 1912, Thomas Myers, of Buffalo, N. Y., owned the paintings. Tomlinson-Humes, of Chicago, was then engaged in the business of selling pictures. During 1911, Myers, the owner of the pictures, and Humes, for Tomlinson-Humes, entered into a written agreement concerning the pictures. This agreement was not produced upon the trial, but Humes, president of Tomlinson-Humes, referred to it as a written "option" of purchase from Myers to his corporation, and said that it contained authority in Tomlinson-Humes to sell the pictures. About March 13, 1912, the paintings were shipped by Myers from New York to Tomlinson-Humes in Chicago, and efforts to sell were made. On March 28, 1912, Tomlinson-Humes and E. P. Clark, of Los Angeles, appellee herein, entered into a written agreement, in substance as follows:

It recited that, whereas Tomlinson-Humes "now has an option" on the Myers paintings, "and second party hereby agrees to purchase same from first party" at an aggregate price of $79,000; and whereas the "first party have in their possession by reason of their option from Mr. Myers, certain newspaper clippings; * * *" and "whereas second party hereby engages the services of first party, from March 28, 1912, to July 28, 1914, to resell such paintings for him at a profit, and in order that first party may be compensated for their services in discovering these paintings and presenting this option to second party and for the work which they will be expected to do and for the expenses to which they will be put by reason of this undertaking as provided for herein in preparing a campaign for a resale of said paintings as provided for herein * * * second party hereby purchases from first party above named * * * paintings * * * (paying them a profit over and above their option price from the said Thomas Myers) for a total price of $125,000, and contemporaneously herewith makes payment for such paintings with four (4) promissory notes of thirty-one thousand two hundred fifty dollars ($31,250) each, with interest * * *—it being understood that second party allows first party to make the profit represented by the difference between the price which they have to pay Mr. Myers and the purchase price herein named," by reason of the provisions in the agreement contained requiring the

233 F.—59

party of the first part to stand all expenses, etc. The agreement also provides:

"It is further understood that if first party can obtain any concession by way of commission or reduction in price from said quoted option price from the said Thomas Myers, they are to have the same as compensation for their work in bringing the matter to the attention of second party and of disposing of them for Mr. Myers."

The second party—

"employs first party as his agents and brokers from March 28, 1912, to July 28, 1914, and first party hereby accepts this employment and agrees to serve second party as brokers and agents in the sale and disposition of said paintings."

Then follow provisions with respect to prices for which the paintings are to be sold and the methods of sale, and it was agreed that in case of sale, the first moneys received were to be applied to the payment of the four notes of $31,250 each and interest until the notes should be entirely paid. Further clauses relate to compensation, to the rights of Clark, within the expiration of a year from the date of the contract, to withdraw the paintings by the payment of certain sums, and provide that if the right of withdrawal was not exercised, the paintings were to remain in the hands of Tomlinson-Humes for sale until the expiration of the contract.

The Tomlinson-Humes people were to use their best efforts to make a sale, and were to pay all expenses and to keep the paintings insured in the name of Clark, and were by the agreement "clothed with full power and authority" to sell the pictures as provided in the agreement, and "to assign, transfer and deliver the same" on making sales, and to receive and receipt for the purchase price thereof, and to make all reasonable and necessary provision for their safe-keeping, exhibition, and insurance.

On April 10, 1912, the corporation, by Humes, its president, wrote to Clark at Los Angeles that he would like to have Bennett, Mr. Clark's agent, go to Buffalo the following week; that he would take the attorney of the Tomlinson-Humes corporation with them—

"to see that the transfer of title is properly made, and we will use every precaution to fully protect your interests in the matter and see that you get a clear and perfect title to the paintings."

The paintings at that time were in Chicago, in the possession of Tomlinson-Humes. The letter stated that the Tomlinson-Humes people did not have the original documents which Mr. Myers was under contract to deliver to them—

"but we will obtain them when we go to Buffalo to make payment to him of the purchase price. We are making great plans for a successful campaign for selling these paintings for you."

In a subsequent letter, dated at Chicago, May 3, 1912, Humes, as president of Tomlinson-Humes, again wrote to Clark, at Los Angeles, telling him that they had obtained sufficient money on Clark's paper to pay Myers, and that they were leaving that night for the East to make payment to Myers. The letter added:

"We will have the transfer of the pictures made in a manner which will satisfy both Mr. Bennett and our attorney."

It appears in evidence that Mr. Humes, accompanied by Mr. McArdle, attorney for Tomlinson-Humes, went to Buffalo with the understanding that Mr. Bennett was to meet them in Buffalo after some matters regarding the title to the paintings had been looked into by Mr. McArdle. As soon as Mr. McArdle was satisfied that everything was "all right," and that Tomlinson-Humes "were in shape to close the deal," they were to telegraph Mr. Bennett to come to Buffalo from Chicago. They telegraphed to Bennett, who reached Buffalo next day after Tomlinson, Humes, and McArdle arrived. The pictures were shipped to Buffalo, where Mr. Myers lived.

On May 11, 1912, the several persons concerned met at the Lafayette Hotel. Mr. Humes, Mr. Tomlinson, and Mr. McArdle were there. They had three connecting rooms. The pictures were in the middle, or Tomlinson's, room. Mr. McArdle, after stating that Humes asked him how the transaction between Clark and Tomlinson-Humes could be carried out so as to vest the title absolutely in Clark without disclosing to Myers the name of Mr. Clark, testified:

"I said the only way that could be done was to have Mr. Myers, after he had fixed the terms of his deal with them, make a bill of sale, and Tomlinson-Humes execute a similar bill of sale to Mr. Clark, and make delivery of it. He told me in this same interview that Mr. Bennett would be on [hand] to represent Mr. Clark in the closing of the deal, and that there was one thing particularly that Mr. Clark desired, and that was that Mr. Bennett should be present and Mr. Myers should identify all of those paintings.

"Mr. Humes, Mr. Tomlinson and I went to Buffalo, putting up at the Lafayette Hotel, occuping each a room in a series of three. * * * After arriving in Buffalo, we met Mr. Myers and his daughter at the office of his attorney, Mr. Spaulding. Then we took up the question of obtaining by Tomlinson-Humes, Incorporated, a reduction in price named in the contract between Mr. Myers and Tomlinson-Humes, Incorporated. When that was done I investigated the title as shown by the papers they produced. Amongst them were Defendants' Exhibits 15, 16, and 17. Those negotiations covered two or three interviews. I believe we made a couple of visits to our rooms, and I found on one of the earlier visits to our rooms that 14 pictures had been placed in the middle room occupied by Mr. Tomlinson.

"We were in Buffalo a day before the papers were finally executed, some time during the forenoon of the day after we arrived there, and on the same day the papers were signed Mr. Bennett came to the rooms. I was introduced to him, or he to me, as Mr. Clark's nephew or representative. Mr. Humes said that Mr. Clark understood that he was to have me for his attorney to look after Mr. Clark's interest, and that he was desirous to have Mr. Bennett present when Mr. Myers would identify those pictures. It was then stated that it would be arranged that Mr. and Miss Myers and their attorney would come to the hotel, identify the pictures, and the deal would be closed right then and there, and the pictures turned over and the possession given to Mr. Bennett for Mr. Clark. We then went to Mr. Spaulding's office again; where eventually Tomlinson-Humes, the two Myers, and Mr. Spaulding had arranged the question of price and other details and papers were drawn up, amongst them Defendants' Exhibit 2. The question then came up as to how the property should be placed in Mr. Clark, and we had drawn up Defendants' Exhibit 3. I believe there were some other papers drawn up. Exhibit 17 was produced at the time, and Exhibits 15 and 16 were prepared while these negotiations were going on. When everything was ready, an appointment was made by which the parties were to meet in Mr. Humes' room. We came over from the office; by arrangement Mr. Bennett was there. Mr.

Myers and Miss Myers were introduced to Mr. Bennett, and I think it was after we entered Mr. Humes' room in the suite that Mr. Myers identified those pictures to Mr. Bennett. About this I am not sure. Mr. Myers, Miss Myers, Mr. Tomlinson and myself entered Mr. Humes' room, and Mr. Humes turned over to Mr. Myers and his daughter and attorney the money and notes. Mr. Myers, his attorney and daughter, turned over Defendants' Exhibits 2, 15, 16, and 17. Possibly there were some other papers. To these were then attached Defendants' Exhibit 3, which had already been signed by Mr. Humes, and we left the room. Mr. Bennett was in the adjoining room where the pictures were. Mr. Myers identified them to him, going to one after another, stating where he got them and giving a short history of each picture. Then these papers, Defendants' Exhibits 2, 3, 15, 16, and 17, were delivered to Mr. Bennett. Mr. Bennett was told by either Mr. Humes or myself, There were the pictures, now, for him to take possession of; that they were his. Then the Myerses and their attorney left, and a discussion arose between Mr. Humes and Mr. Bennett and Mr. Tomlinson about the protection of those pictures overnight. We all left the room, Tomlinson and myself to surrender our rooms and get transportation for home that night, and Mr. Humes and Mr. Bennett to arrange for the pictures. When we returned I learned that Mr. Tomlinson had surrendered his room just as I had, and Mr. Bennett was assigned to Mr. Tomlinson's room where these pictures were located. I then sat down, and after the witness clause I wrote upon it this receipt, which now appears on it, on Defendants' Exhibit 3. When I had completed my writing, Mr. Humes signed in the place where it now appears. We were then right in the room with the pictures. This took place in the afternoon of the 11th, and Mr. Tomlinson and myself left and came home."

Exhibits 2 and 3, referred to by Mr. McArdle, are bills of sale; Exhibit 2 being bill of sale of the pictures made in usual form from Thomas Myers and his daughter to Tomlinson-Humes, Incorporated, the consideration named being $2 and other good and valuable consideration. Exhibit 3 is a bill of sale of the same pictures by Tomlinson-Humes to Clark for a consideration of $2 and other valuable considerations, paid by Clark. This latter bill of sale conveys the paintings to Clark—

"under and subject to the terms of sale contained in agreement of March 28, 1912, between the parties hereto and pursuant to the sale therein contained."

Except for this clause, it is similar to the bill of sale from Myers to the Tomlinson-Humes corporation.

On May 14, 1912, Humes wrote from Buffalo to Clark, in Los Angeles, to the effect that they had obtained money on his notes, and that on Saturday, when Mr. Bennett was present, they had made the transfer of the pictures from Myers to themselves and from themselves to Clark, and that the transfer was pronounced perfect. Bennett, Clark's representative, testified that when in Buffalo, Myers identified each picture, and that then the deeds and papers were all turned over to him (Bennett), and that he took possession of them, and that this was done in the same room with the pictures; that he then made arrangements to store the paintings that evening; and that he then told Tomlinson that he desired a receipt for the paintings, and that thereupon a receipt was drawn on the bottom of the bill of sale, Exhibit 3 heretofore referred to, from Tomlinson-Humes to Clark. This receipt, signed by Tomlinson-Humes, acknowledged the receipt—

"from Henry C. Bennett agent for E. P. Clark assignee in above bill of sale the paintings therein assigned to hold the same under the terms of the con-

tract of March 28, 1912, therein referred to, the possession being delivered in the Lafayette Hotel, Buffalo, N. Y., after the paintings had been identified by Mr. Thomas Myers mentioned in said contract of March 28, 1912."

After the execution of this receipt, Bennett took possession of the room in which the pictures were.

Thereafter the pictures were taken back to Chicago by the Tomlinson-Humes corporation. About February, 1913, the paintings were taken from Chicago to New York, where, under the direction of S. J. Thurber, an employé of Tomlinson-Humes, they were delivered at the residence of Mr. W. A. Clark. An effort was made by Thurber to sell them to Mr. W. A. Clark, but he declined to buy them. The custodian in charge of the house of Mr. W. A. Clark testified that Mr. Thurber told him that the pictures belonged to E. P. Clark, of Los Angeles, that after Mr. W. A. Clark declined to buy them, Mr. Thurber asked if the pictures could be left at Mr. W. A. Clark's for a little time, as he wished to show them to some one else in New York, and that as custodian of Mr. W. A. Clark's premises, he allowed the pictures to remain at Mr. Clark's house. On July 17, 1913, in the United States District Court in Illinois, Northern District, Eastern Division, petition in bankruptcy was filed against Tomlinson-Humes, and on July 30th the corporation was adjudged a bankrupt, and the appellant herein was appointed trustee. Afterwards, in September, 1913, in accordance with a letter to him from Mr. Bennett, the custodian of the Clark residence in New York shipped the pictures to E. P. Clark, at Los Angeles. Shortly after demand upon the custodian of the Clark house in New York on November 26, 1913, the trustee filed the bill in this suit.

[1] Looking first into the original agreement between Myers, owner of the pictures, and Tomlinson-Humes, we find nothing to show that Myers transferred his property in the paintings for a consideration paid by Tomlinson-Humes. What Myers did, however, was to give to Tomlinson-Humes an option or right to buy the pictures upon payment of certain sums of money, and he turned the possession of the pictures over to the optionee in order that it might better effect a sale. It is not hard to understand how such a transaction might come about. It must be generally true that the market for highly valuable paintings is very limited, and dealers in them must be comparatively few in number; and it might well be that a dealer, not having the means to buy outright, would obtain from the owner an option, and, to help bring about sale, that the owner might intrust his pictures to the holder of the option, so that such holder could exhibit them at its established place of sale and thus be in a better position to deal with purchasers and deliver readily in the event a buyer is found. But, in the case before us, until the option was determined, no title passed from Myers, the owner, to Tomlinson-Humes, and in the absence of clear evidence to the contrary, it is not to be presumed that the owner intended that title should pass until the purchase price was paid. Guss v. Nelson, 200 U. S. 298, 26 Sup. Ct. 260, 50 L. Ed. 489. If the accident of fire had destroyed the pictures while Tomlinson-Humes had them under the option contract with Myers, unquestionably Myers,

not Tomlinson-Humes, would have been the loser, because the latter's possession was not as owner, but only as holder of an option, with possession intrusted to it for special purposes. The transaction seems plain thus far, and, considering the character of the property, it does not impress us as at all peculiar.

[2-4] We may therefore turn to the subsequent incident, that which arose between Tomlinson-Humes and Clark, of Los Angeles. Tomlinson-Humes, with its valuable option, wanted to make some money by finding a purchaser for the pictures at a sum above the option price given to it by Myers. Its plan evidently was to find a buyer who would pay in advance at least sufficient money to cover the option price, then to pay Myers with the money so advanced by the customer, take formal title to themselves under the terms of the option, and then transfer formal title to the new purchaser. In intent and effect, this plan was carried out. Finding a buyer in Clark, on March 28, 1912, at Los Angeles, Tomlinson-Humes made the agreement heretofore substantially recited. When this agreement was made, Clark knew of the Myers option to Tomlinson-Humes, and the agreement refers in express terms not once, but several times, to an "option," which by common, as well as legal, understanding, is simply a contract by which the owner of property agrees with another that he shall have a right to buy at a fixed price within a certain time. Clark also knew that there was no obligation on the part of Tomlinson-Humes to buy from Myers, and he knew that there was no title to the pictures in Tomlinson-Humes corporation on March 28th, when he negotiated with it. But evidently he wanted to acquire the pictures in order to sell them at a profit, and to that end he agreed with Tomlinson-Humes, the holder of the option, to advance to it money sufficient to take up the option, and also an additional sum, and at the same time he made an agreement which, in his belief, would assure to him, not the option contract with Myers, but the pictures which were the subject-matter of the option contract, but which he knew could not become his unless Tomlinson-Humes exercised its option. The Tomlinson-Humes corporation, wishing to make profits to accrue if Clark should buy and then sell through it as his agent, agreed to the plan, and it was paid money considerably more than enough to take up the option, and it was agreed that it should be made agent for Clark in selling the pictures. The arrangement obviously contemplated that the option should be taken up by Tomlinson-Humes. There was no formal assignment of the option, and it is plain that neither Clark nor Tomlinson-Humes meant to substitute Clark for Tomlinson-Humes with the right to deal personally directly with Myers.

In explanation for proceeding as they did, the testimony is that Tomlinson-Humes was anxious to suppress the name of their purchaser, and wished title formally to pass through their corporation, because, if Clark's name should appear, they might have difficulty in securing concessions which they hoped to obtain by buying from Myers at a price less than the option called for. The formalities of transfer were carried out at Buffalo, N. Y. The pictures were there; attorneys repre-

senting Myers and Tomlinson-Humes and Clark, and all the parties except Clark, were there. With money previously obtained from Clark, Tomlinson-Humes, who had possession of the pictures, paid Myers and received a formal bill of sale from him. Then Tomlinson-Humes made a bill of sale to Clark and delivered the possession of the pictures to Clark's agent, who formally took possession of them, and, after making provision for their safe-keeping overnight, turned them over to Tomlinson-Humes, who had, by the agreement of March 28th, been appointed Clark's agents and brokers to sell the pictures. Clark, according to the evidence, acted in the best of faith, and at the time of the transactions between himself and Tomlinson-Humes there was nothing to arouse any suspicion on his part as to the solvency and good faith of Tomlinson-Humes; nor is there any evidence to show bad faith or wrong on the part of Tomlinson-Humes. Nothing is to be inferred against Clark by reason of his turning the possession of the pictures over to Tomlinson-Humes. It is true that corporation had been in possession while it held the option given by Myers. But Clark had a right to make Tomlinson-Humes his agent in selling the pictures after he took them. Tomlinson-Humes was engaged in the business of selling valuable pictures, had a place of business in Chicago, had expert restorers, and having made a sale to Clark, it was natural that he should repose confidence in that company and make it his agent to take the pictures and sell them to other possible buyers. As it was evidently intended should be done, Tomlinson-Humes took Clark's money to buy formally for itself from Myers. In this way title in a legal way would pass to Tomlinson-Humes, and Myers would be eliminated. But inasmuch as Clark had purchased from Tomlinson-Humes the property itself which it but expected to acquire, and paid the consideration named in the option before the exercise of the option, as between Clark and Tomlinson-Humes, the latter is to be regarded as having made an equitable assignment of the property it might acquire under the option; hence Tomlinson-Humes became bound to transfer the property and formal title thereto to Clark just as soon as it would receive it from Myers, the legal owner. Field v. New York, 6 N. Y. 178, 57 Am. Dec. 435; Mitchell v. Winslow et al., Fed. Cas. No. 9673.

The agreement between Clark and Tomlinson-Humes was somewhat complex, yet, when considered with the predominating facts shown, the clear intent throughout the whole transaction was that Tomlinson-Humes would buy the pictures and deliver them to Clark when acquired, and that thereafter Tomlinson-Humes would be agent of Clark to sell for Clark's account. Clark received them into his possession at Buffalo, and thereafter Tomlinson-Humes, although it held possession, had no interest in them, except by way of commissions in the event of sale under the provisions of the agreement. And considering the nature of the contract of agency, the effect of the bankruptcy of Tomlinson-Humes was to revoke the authority of its agency. Mechem on Agency, § 267; Cushman v. Snow, 186 Mass. 169, 71 N. E. 529; Jetter Brewing Company v. Scollan, 48 Misc. Rep. 546, 96 N. Y. Supp. 274, 15 Am. Bankr. Rep. 300.

In the final analysis, the Tomlinson-Humes corporation was really but a conduit, taking title in its own name, but with money furnished by Clark, and subsequently transferring to Clark, who bought in good faith and took possession without any intent to defraud creditors or purchasers. The law, therefore, will not regard Tomlinson-Humes as having had an interest in the pictures to which a judgment lien could have attached, or which passed to the creditors when bankruptcy came. Williston on Sales, § 137; Story's Equity Jurisdiction, §§ 1040, 1040b; Bailey v. Baker Ice Machine Company, 239 U. S. 268, 36 Sup. Ct. 50, 60 L. Ed. 275.

The equities of the case are with Clark, and the lower court was correct in sustaining his claim of ownership and right of possession.

The decree is accordingly affirmed.

3. BANKRUPTCY ⬅165(1)—CLAIMS—CONVERSION.
    In such case the fact that the brokers did not on demand return the securities did not, where time was extended, amount to a conversion leaving the customer only a right of action which could be proved as a claim in bankruptcy, and therefore the return did not amount to a preference.
    [Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. §§ 259, 266;  Dec. Dig. ⬅165(1).]

4. BANKRUPTCY ⬅140(3)—PROCEEDINGS—PROOF OF CLAIM.
    That one who loaned securities to brokers proved his claim for the value of such securities does not prevent him from reclaiming the actual securities themselves, provided he reserved the right to do so.
    [Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. § 225;  Dec. Dig. ⬅140(3).]

⬅For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes